**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1358-18T4

KARALYN ROSENBLUM,

 Plaintiff-Respondent,

v.

MARK ROSENBLUM,

 Defendant-Appellant.

_____

Submitted May 12, 2020 - Decided July 13, 2020

Before Judges Accurso and Rose.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Somerset County, Docket No. FM-18-0824-17.

Siragusa Law Firm, LLC, attorneys for appellant (Lynette Siragusa, of counsel and on the briefs).

Respondent has not filed a brief.

PER CURIAM

 Defendant Mark Rosenblum appeals from a final judgment of divorce,

contending the provisions of the judgment permitting his ex-wife, plaintiff

Karalyn Rosenblum, to retain her 403(b) retirement account, denying him alimony and awarding plaintiff $142,769 in attorney's fees "were so manifestly unsupported by the relevant and credible evidence presented during trial that they must be modified."  Plaintiff, through counsel, has advised us of her position that there was no error, and that she would not participate in the appeal, being content to rely on the trial record.  Having reviewed that record, we find defendant's arguments to be entirely without merit, requiring no extended discussion here.  See R. 2:11-3(e)(1)(E).  Accordingly, we affirm, substantially for the reasons expressed in Judge McDonald's thorough and thoughtful opinion from the bench on October 15, 2018.

The relevant facts are set out at length in Judge McDonald's opinion and there is no need to recount them here.  We note only that the parties are both college educated, married in their thirties when both were established in careers and have no children.  Their marriage lasted eight years and eleven months.  Besides seeking open duration alimony, defendant also asserted a $10,000,000 Tevis[1] claim arising out of a domestic violence incident that ultimately ended in the parties' agreeing to civil restraints — running both ways.  Defendant dismissed his Tevis claim shortly before a scheduled

---

[1]  Tevis v. Tevis, 79 N.J. 422 (1979).

independent medical exam, but not before plaintiff was forced to hire personal injury counsel and an expert to defend the claim.

The issues for trial centered on defendant's alimony claim, distribution of their retirement accounts and counsel fees. Plaintiff, who had been living with her parents during the divorce, also had several smaller claims related to defendant's failure to maintain the marital home where he continued to live, pay his share of its carrying costs and comply with court orders requiring its sale. Defendant abandoned his claim that the parties owed $50,000 to his parents after plaintiff issued subpoenas compelling their appearance at trial.

One of the parties' rare points of agreement in the case was that defendant had a long-standing gambling problem. Plaintiff maintained she only learned of it, however, a year into the marriage when defendant was forced to confess he owed $30,000 to his bookie. Defendant claimed he'd told her about his addiction long before they married. Defendant restarted his attendance at Gamblers Anonymous meetings, and plaintiff got very involved in a related program for the families of gamblers. There was no dispute that as a result of advice they received in these programs, plaintiff became the one primarily responsible for the parties' finances. Plaintiff's role in that regard was central to two important disputes at trial, defendant's failure to file a

meaningful case information statement, he claimed because he had had no knowledge of the parties' finances and, more important, the losses in defendant's retirement account.

In her opening, plaintiff's counsel acknowledged plaintiff's central role in controlling the couple's money in an effort to protect their assets, but contended those efforts were insufficient to preserve defendant's 401(k), which he dissipated by engaging in risky options trading. Counsel catalogued what she characterized as defendant's many bad faith actions "which have prolonged this case unnecessarily, . . . caused the expenditure of literally $150,000 in counsel and expert fees for [plaintiff] and which continue to . . . prevent the reasonable resolution of the issues in this case." Chief among counsel's complaints was defendant's pursuit of "open-durational alimony on an eight-year marriage," when he was capable of maintaining himself at the standard of the marriage and was "in a relationship that is tantamount to marriage" with another woman "and, in fact, engaged in a religious ceremony" with her, commemorated on the internet wedding site, "The Knot."

Defendant's counsel countered that plaintiff was using her and her family's "financial might to whittle this man down to nothing." While conceding defendant out-earned plaintiff in the early years of their marriage,

A-1358-18T4

counsel contended it was not true when they separated. Defense counsel argued defendant needed alimony because of his inability to become reemployed in the financial sector after he was fired for going to the FBI with information that his employer was violating insider-trading laws.

As to plaintiff's claims that defendant dissipated his retirement account, defendant's counsel contended it was "much to do about nothing." Defense counsel argued in his opening that defendant "didn't intentionally throw away the money," or take "it to Las Vegas and gamble[] it away at the craps table." Instead, counsel argued defendant "actively traded with full working knowledge of [plaintiff]." Counsel contended defendant "was trying to make investments and you will hear testimony that he thought he was investing it properly or wisely and the investments just didn't make money. They lost money. That's what happens with investing."

But that was not the testimony the court heard. Instead, defendant denied that he was responsible for the trading losses in that account. He testified that plaintiff and her father traded in his 401(k), although providing no proof of that, and swore he had "never traded [options] in [his] life." Defendant also denied having married his girlfriend, although he identified several photographs in evidence of himself, his girlfriend and her family at a

A-1358-18T4

formal function attended by over fifty guests, including one posted with a caption congratulating them on their "great wedding." Defendant acknowledged that he and his girlfriend had participated in a religious ceremony on that occasion, which was presided over by a cleric, but claimed he didn't understand Arabic and thus didn't "know what was said." He denied "sign[ing] anything."

After seven days of trial, in which the parties, plaintiff's father and her employability expert all testified, and the court admitted hundreds of pages of exhibits, the trial court placed a meticulously detailed decision on the record addressing each claim of both parties. The court took particular care in explaining its credibility findings, noting those findings strongly influenced its decision on several substantive claims. While finding plaintiff and her father provided clear and credible testimony, the court found defendant "told one lie after another, . . . [s]ome . . . so blatant that it was clear [defendant was] making it up right as [he was] testifying." Critically, the court concluded defendant "shifted [his] positions on the important issues in this case at each and every turn."

Specifically, the court detailed six instances in which it found defendant's testimony demonstrably, and deliberately, false, including his

6

testimony about his gambling during the course of the marriage and the trading losses in his 401(k).  Regarding the 401(k), the court addressed defendant directly, saying

> [y]ou sat there while your lawyer . . . gave an opening statement after consulting with you where you said that it was your strategy, you did the trading, and it shouldn't be held against you because it was a good strategy but it was unfortunate you lost the money. You sat there while he said that.  You went a couple days later and took the stand, swore to tell me the truth, and now you claimed that . . . your wife and her father traded in that account.  There was absolutely no proof of that and it was very credible proof that you did it.

The court noted that account went from more than $200,000 to less than $500 in less than two-and-one-half years, and that the percentage of traded options grew from 9.3 to 92.9 over the same period.  It referenced a monthly statement for the same account, in evidence, consisting of over one hundred pages, twenty pages of account positions on a day-to-day basis, and another eighty pages of account activities, reflecting $570,000 traded in one month. The court noted that "[n]obody else is listed on the account," and, that although defendant "testified [he] had no knowledge of options," he worked in the financial services industry and previously held a Series 7 general securities representative license and a Series 63 uniform securities agent license.

7

As for defendant's testimony regarding whether he had married his girlfriend in a religious ceremony, the court found that while it could not make a finding that defendant had actually married, "the bridal pictures and the rings and the announcements, the religious ceremony," led it to conclude defendant may well have "remarried" in some fashion prior to his divorce from plaintiff.

Underscoring the mutual duty divorcing spouses have "to deal fairly with each other," see Tannen vs. Tannen, 416 N.J. Super. 248, 262 (App. Div. 2010), aff'd, 208 N.J. 409 (2011), the court found defendant had breached that duty by acting "with utter contempt and complete disdain for his obligations as a litigant." The court noted that while "[i]t is the very rare case when the need for a trial is caused by one party alone, . . . [t]his is such a case." The court pointedly found that plaintiff "was forced to endure the trial solely because of the bad faith of . . . defendant" in taking "outrageous, unconscionable" positions "devoid of legal and factual support," including his "specious" Tevis claim, his "demand for open-durational alimony on a nine-year marriage," his "fictitious claim of $50,000 in debt to [his] parents, and his claim that plaintiff and her father "gambled away [his] $200,000 IRA."

There is no doubt that Judge McDonald resorted to very strong language in condemning defendant's bad faith conduct in the litigation. But having now

8

reviewed the entire record ourselves, we reject defendant's claim that the judge "allowed his negative personal opinion" of defendant "cloud his judgment." That the judge found defendant an unreliable witness who repeatedly offered testimony the judge found not credible does not equate to bias. See Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008) (noting "[b]ias cannot be inferred from adverse rulings against a party"). To the contrary, our review convinces us the trial judge's findings have ample support in the credible evidence in the trial record, and are thus binding on appeal. See Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

The court simply applied well-settled law to the facts as it found them. We are satisfied that in dividing the parties' marital assets, the court properly exercised its broad authority to make "the most equitable allocation between the parties after analysis of the statutory factors set forth N.J.S.A. 2A:34-23.1." Genovese v. Genovese, 392 N.J. Super. 215, 225-26 (App. Div. 2007). We, likewise, find no error in the court having denied defendant alimony on the proofs presented at trial, see Reid v. Reid, 310 N.J. Super. 12, 22 (App. Div. 1998), or in awarding plaintiff significant attorney's fees in accordance

with <u>Rule</u> 5:3-5(c), <u>see</u> <u>Eaton v. Grau</u>, 368 N.J. Super. 215, 225 (App. Div. 2004).

In short, we affirm, substantially for the reasons expressed in Judge McDonald's detailed and comprehensive opinion delivered from the bench on October 15, 2018.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION